## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| JAMES GORDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| MORGAN & MORGAN, P.A. and | ) | JURY TRIAL DEMANDED |
| MORGAN & MORGAN, | ) | |
| JACKSONVILLE, PLLC | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>COMPLAINT</u>

COMES NOW Plaintiff James Gordon ("Plaintiff" or "Mr. Gordon"), through undersigned counsel, and files his Complaint against Defendants Morgan & Morgan, P.A. and Morgan & Morgan, Jacksonville, PLLC (collectively "Defendants" or "the Firm") and states as follows:

## PARTIES

1. Plaintiff James Gordon is a natural person and resident of Jacksonville, Florida. At all relevant times, Plaintiff was an employee of Defendants within the meaning of Title VII, the ADA, and Florida Civil Rights Act, and

conducting his employment services in Defendant's Jacksonville office location.

2. Defendant Morgan & Morgan, P.A. is a professional association law firm, providing plaintiffs' representation in *inter alia* civil rights law, employment law, and personal injury matters and organized under Florida law with its principal place of business in Orlando, Florida. At all relevant times, Defendant was an employer within the meaning of Title VII, the ADA, and Florida's Civil Rights Act, employing more than 500 employees, and is engaged in an industry affecting commerce.

3. Defendant Morgan & Morgan, Jacksonville, PLLC ("MM Jacksonville") is the Jacksonville, Florida branch office of Morgan & Morgan, P.A. Plaintiff worked in Defendant MM Jacksonville in person, except for the period of time between 2020-2021 when the firm transitioned to remote work during Covid. Plaintiff's supervising attorneys Michael Marrese and Jody Wade also worked in MM Jacksonville office during the relevant time. At all relevant times, Defendant MM Jacksonville was an employer within the meaning of Title VII, the ADA, and Florida's Civil Rights Act, employing more than 15 employees, and is engaged in an industry affecting commerce.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action arises under federal law, specifically Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e, *et seq*. and the Americans with Disabilities Act of 1990, as amended, ("ADA"), 42 U.S.C. § 12101 *et seq*.

5. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the wrongful acts and omissions of Defendants giving rise to this action occurred within this judicial district, Defendants are deemed to reside in this District pursuant to 28 U.S.C. § 1391(c)(2), and Defendants operate and conduct business within this judicial district.

## ADMINISTRATIVE PREREQUISITES

7. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about December 12, 2022.

8. The EEOC issued a Notice of Right to Sue on November 29, 2024, and this action is filed within ninety (90) days of receipt of that notice.

9.  All conditions precedent to bringing this action have been performed or have occurred.

## FACTUAL ALLEGATIONS

10. Plaintiff Gordon was employed by Defendants in 2002 in the Jacksonville, Florida office as a case manager and worked continuously in that capacity until 2013.

11. After a brief period away, Mr. Gordon was actively recruited from his then-employer to return to Defendants in early 2015 by partner Greg Prysock, and supervising attorneys Michael Marrese and Donny Owens, due to his excellent performance and expertise.

12. Throughout his nearly twenty-year career with Defendants, Mr. Gordon consistently performed his duties at or above expectations. His exemplary performance was recognized by firm principal John Morgan himself at a firm Christmas event, where Mr. Morgan authorized a special $10,000 bonus for Mr. Gordon, which was provided to him the following workday.

13. Upon Plaintiff's return to Defendants, his second supervising attorney Mr. Wade regularly praised his performance, including via text message, giving him his earned case management bonuses and adding additional amounts for Mr. Gordon "because of the effort" and thanking him for "the hustle."

14. Even in the weeks leading up to Defendants' termination of Mr. Gordon's employment in early 2022, Mr. Gordon's supervising attorney Mr. Marrese awarded him a $5,000 performance bonus for 2021 and was paying him an additional $500 monthly performance incentive from January to March of 2022. In April of 2022, just before terminating Plaintiff, Defendants paid Mr. Gordon a $750.00 performance bonus.

15. Mr. Gordon is a devout Christian whose sincerely held religious beliefs prohibit him from knowingly harming his body or being reckless with substances that could harm his physical body as the "temple of the Holy Spirit."

16. Mr. Gordon further believes that God is his Creator and Healer, including with regard to physical disease and illness, and that he must follow God's will and law over human perceptions and medical expertise, if the two are in conflict.

17. Mr. Gordon's personal faith in Jesus Christ was known to the principals of Defendants, specifically John Morgan and Mr. Prysock, as well as other attorneys and staff and was a topic of conversation at a firm-wide Christmas party prior to Plaintiff's first resignation from Defendants' employ in 2013.

18. Mr. Gordon suffers from an autoimmune chronic inflammatory condition affecting his skin and joints and that induces physical limitation and mobility, detrimentally affecting daily activities.

19. During the COVID-19 pandemic, Defendants' offices across Florida transitioned to a work-from-home model through early 2021. Mr. Gordon received email notices from Defendants regarding the general success of the remote work model, noting no reduced revenues, but increased revenues, as office expenses decreased during that period of time.

20. Thus, as offices across the state were reopening, Defendants weighed the options of continuing some remote work for employees who sought to continue the option with appropriate paperwork submitted.

21. Mr. Gordon first sought to continue in remote work in April 2021 because of his autoimmune-based disability, upon solicitation from Defendants to submit his request as a potentially eligible employee. On April 16, 2021, Defendants denied the request, as failing to specify how his disability "is effected [sic] by COVID."

22. Mr. Gordon resubmitted his disability accommodation, dated April 20, 2021, from Dr. Michael Perry, specifying that "Due to the autoimmune nature of his chronic condition, Mr. Gordon is at a higher risk of contracting infectious diseases including COVID-19."

23. The next day, April 21, 2021, a firm-wide email from principal John Morgan abruptly halted Defendants' disability accommodations discussions with Plaintiff, as Mr. Morgan dictated Defendants' new policy: "A very few people

have asked to continue to work from home.  I am sorry to say that will not be happening.   We are not equipped to support both at home and in office work….If you are determined to work from home it won't be with our firm. Please let us know so we can be moving to replace you."

24. In the same email, Morgan also noted "I would also like any of you who have not been able to get a vaccine to call me directly so I can arrange it.  My entire family and extended family are now vaccinated."

25. Defendants never discussed further accommodations with Plaintiff for his disability, and never provided alternative options for accommodation at any time.

26. Mr. Gordon was forced to return to in-person work at the Jacksonville office of Defendants by May 3, 2021.  As a result of this change, Mr. Gordon had to purchase a car and increase his family expenses significantly, including gas and travel costs, as well as food costs.

27. On May 14, 2021, John Morgan began an aggressive email campaign targeting unvaccinated employees and creating a work culture hostile to Plaintiff with his disability and religious beliefs affecting his ability to obtain COVID-19 shots.

28. Mr. Morgan's emails contained explicit discriminatory and harassing content, repeatedly comparing COVID-19 non-vaccination to frightened dogs,

irrational fears, and mental illness.  The emails included the following statements:

a. May 16, 2021 – "There are quacks on both sides of this….Beginning tomorrow the vaccinated will be allowed to work with no mask….Many law firms mandated that all employees be vaccinated before they return to work. We disagreed with this approach. It is your body and your health and any fears you may have are real.  I have an irrational fear of heights so I understand fear."

b. August 4, 2021 – "I want all of you to know that for those of you who do not choose to be vaccinated we are not judging you.  Fear is real.  Whether imagined or real.  Some of us believe in ghosts.  Ghosts scare me."

c. August 4, 2021 – "There are many reasons for not being vaccinated politics, irrational fears and genuine concerns.  Some people will never get on a plane……….ever.  Many of my Kentucky cousins will not fly…."

d. August 4, 2021 – "Some religious folks handle rattle snakes and are not vaccinated.  Making sense of so many people is impossible"

e. August 4, 2021 – "My little sister is petrified to fly.  She is like my dogs on the fourth of July when she is in and [sic] airport and ready to board.

Under the table.  She takes a valium before she leaves home and guzzles bloody Mary's at the airport.  Really embarrassing…..As I said fear is real and we understand it is….Morgan's don't ride motorcycles or handle rattle snakes at church………………but I'm fine if you want to. Just don't bring the snakes in my car."

f.  August 23, 2021 – "But we do know that 95% of all Covid deaths are the unvaccinated and it is a very painful death.  A vaccine is not 100% to block Covid but the alternative seems foolish…."  "I pray you get it."

g.  August 25, 2021 – "We have been inundated by so many coworkers who are afraid to be with the unvaccinated.  Thank God many of you now are….By and large almost everyone who dies or who is critically ill is the unvaccinated…."

h.  August 25, 2021 – "As I mentioned in an earlier email some people have a deathly fear of flights.  That fear is real and your fear is real or in some cases just political….There are some who are unvaccinated but have no trouble handling venomous snakes in religious ceremonies."

i.  August 25, 2021 – "I can't let fears which I deem unfounded dictate what I do for the safety and welfare of the vast majority.  Children are now in ICUs.  We can bring it home to them."

j.  August 25, 2021 – "For those of you who are not [getting the shot] because your spouse will be mad……….what they don't know doesn't hurt them."

k.  September 2, 2021 – "The cost to our insurance is staggering….I don't judge anyone because of their fears.  The vast majority of those unvaccinated are the undereducated and those with strong political beliefs."

l.  September 7, 2021 – "It is really simple.  Please get vaccinated."

m.  September 28, 2021 – "In Orlando I terminated a paralegal who refused to always wear a mask…. We are in a fucking pandemic. More people have died from this than the Spanish Flu pandemic.  Most all of us are vaccinated….We have people working in our offices who are scared for their lives because some are not."

n.  September 28, 2021 – "I have hoped that watching all of this death may prod you into the vaccination for yourself and for your family.  I have come from a place of love and concern.  But when you decide to say 'fuck you' to your vulnerable coworkers it's time for you to go.  I can't imagine what people are thinking.  Some people just don't want to be told what to do I guess….But my choice is to protect my firm from your recklessness or sincere fear."

29. In August 2021, Defendants implemented a firm-wide COVID-19 vaccination policy that mandated vaccination for all employees, following a firm-wide "survey" of COVID-19 vaccination status of all employees.

30. On August 4, 2021, Morgan announced the discriminatory policy that he directed "HR to hire no more staff or attorneys who are not vaccinated" and stated the firm would become "fully vaccinated over time."

31. On August 25, 2021, he affirmed Defendants' policy was a COVID-19 mandate: "I know making this mandate will cause us to lose great talent and friends....And I care enough about you to warn you. It is easier to get a job with a job."[1]

32. John Morgan speaking on behalf of Defendants asserted that religious beliefs and racial differences informed individual employees' choice with regard to COVID-19 vaccination. "Interesting and ironic is the people most likely to be unvaccinated are evangelicals who voted Trump and African Americans and Hispanics."

---

[1] Defendants' discriminatory intent in the application of the COVID-19 vaccination mandate against Plaintiff Gordon is evidenced by John Morgan's personally terminating Devon Hitch, another unvaccinated employee with a disability requiring medical accommodation based on her Mayo Clinic doctors' recommendation. On September 30, 2021, Mr. Morgan summarily terminated Hitch via email with one day's notice, explicitly stating it was because she "made up [her] mind" not to get vaccinated. Mr. Morgan expressly refused to consider any accommodations for Hitch. Mr. Morgan also pressured Ms. Hitch to provide her doctors' information to him, claiming that they gave her "false advice," and that he had "a call in to alert the hospitals [her doctor] is affiliated with of the advice he is giving" because "[w]e can't have a guy like that out there."

33. Defendants expressly rejected any option for accommodation against COVID-19 vaccination, and strictly enforced the policy for both current employees and applicants, contrary to federal and Florida law, which require options by employers for employee accommodation procedure.

34. Notwithstanding the position of Defendants regarding accommodations, Mr. Gordon submitted his doctor's documentation again on August 24, 2021, regarding his need for disability accommodation from COVID-19 vaccination and masking.

35. At no time did Defendants inquire regarding Mr. Gordon's accommodations requests, begin any interactive process regarding possible accommodations from its policies, nor request additional paperwork regarding Mr. Gordon's asserted accommodations.

36. When asked whether he had submitted his vaccination verification, Mr. Gordon asserted both religious and medical need for accommodations against COVID-19 vaccination and masking on October 21, 2021.

37. Defendants did not expressly deny Plaintiff's accommodations requests.

38. Mr. Gordon's supervising attorney Mr. Marrese came to Mr. Gordon's office in the end of 2021 stating that Mr. Gordon needed to find another job because Defendants were going to terminate his employment.

39. Mr. Marrese also frequently asked Mr. Gordon about his COVID-19 vaccination status, and disregarded any protected basis for Mr. Gordon to seek exemption and accommodation from the mandate.

40. Defendants simply ignored Plaintiff's requested accommodations, in contravention of federal and state law.

41. Toward the end of January 2022, Mr. Gordon had a medical crisis requiring use of sick leave for recovery. He provided proper notice to his supervising attorney and came in to work with a donut seat cushion, despite being in great pain.

42. On February 23, 2022, Defendants through HR Director Tonya Williams demanded that Plaintiff wear a mask and asserted that if he did not, he would be "asked to leave the office."

43. Instead of engaging in any interactive process regarding accommodations, Defendants began a campaign of coercion, one week later.

44. Suddenly, for the first time in two decades of work with Defendants, on March 3, 2022, the Firm disciplined Mr. Gordon ostensibly for violating an attendance policy, citing "tardiness" and "insufficient amount of work hours." Since Plaintiff's supervising attorney could provide no current policy against which the discipline was issued, Mr. Gordon refused to sign the "Employee Warning Report."

45. The purported attendance policy to which the discipline referred **was not issued to Plaintiff until nearly two weeks later on March 14, 2022.**

46. Prior to March 14, 2022, case managers employed by Defendants were never restricted to specific hourly periods of work, as salaried employees who could work the schedule as agreed by supervising attorneys.

47. On March 10, 2022, Mr. Gordon also had a serious family emergency for which he requested emergency leave from his supervising attorney Mr. Marrese, who did not object to the use of leave.

48. The March 14, 2022, scheduling policy ostensibly required selection of specific hourly schedules for all employees in the Jacksonville office, but Jennifer Perrow, a trainer in the office told Mr. Gordon that it was a policy only applicable to hourly wage employees and would not be relevant to him as a salaried case manager. Indeed, other case managers in the Jacksonville office were not complying strictly with any hourly schedule pursuant to the March 14 new policy.

49. Again, on May 10, 2022, Mr. Gordon was presented with written discipline purporting to be related to the March 14, 2022 schedule policy, but he was denied an opportunity to review the discipline before signing, and he did not sign it.

50. Based on that May discipline, Defendants suspended Mr. Gordon for two days, and reduced his paycheck by $450.00.

51. When he returned to the office on May 13, 2022, Mr. Marrese informed Plaintiff that he had been searching for new employment for Mr. Gordon, and provided him a vacancy notice at Citizens Insurance, asserting that the salary was better than his then-salary with Defendants. Mr. Marrese pressured Mr. Gordon for an answer whether he would voluntarily resign and leave the firm.

52. When Mr. Gordon returned to the Firm in 2015, Defendants and Mr. Gordon agreed to specific arrangement regarding his paid time off ("PTO") that he would receive 6.769 hours of PTO per biweekly pay period, which would rise to earning 8.308 hours of PTO in September 2017.

53. However, since 2019, Defendants failed to calculate Plaintiff's accruing PTO and persisted in awarding zero PTO hours to Mr. Gordon, contrary to their agreement and the Firm's own Employee Handbook policies.

54. Only in April 2022, did Defendants correct this nearly three year PTO discrepancy, placing PTO 400 banked hours in Mr. Gordon's employment file.

55. Thus, when Mr. Marrese increased pressure on Plaintiff to resign from the Firm in early May, he also assured Mr. Gordon that if he would voluntarily

resign, Defendants would allow him a severance package that included only half of his banked and newly returned PTO in cash.

56. On May 16, 2022, Mr. Marrese called Mr. Gordon into his office and again demanded an answer to whether Plaintiff would voluntarily resign from Defendants' employ. When Mr. Gordon yet again confirmed he would not resign, Mr. Marrese expressed his surprise that Mr. Gordon, as a Christian, would make the choice not to get COVID-19 vaccination and continue to work at the Firm.

57. In the early afternoon, after that meeting, Plaintiff was again summoned, this time to Defendants' partner Jason Miller's office, together with Mr. Marrese and HR Ms. Williams. Mr. Gordon was asked to respond to the two prior written disciplines issued against him, and he asked to be transferred to a different supervising attorney.

58. Mr. Gordon's request was denied. In the same meeting, Mr. Gordon was again offered a severance including half of his banked and recently returned PTO in cash, and told if Defendants terminated his employment, he would get none of that PTO in cash.

59. Mr. Gordon asked for time to consider the option, but within less than an hour, he was provided termination paperwork, including a Release for his signature, which he did not sign, and he was escorted out of the building.

16

60. Nine days after Plaintiff refused to resign voluntarily and sign the Release, Defendants continued with their preparation of a pretextual basis for their unlawful termination of Mr. Gordon on grounds of religious and disability discrimination.

61. On May 27, 2022, by email, Mr. Marrese expressly asked Defendants' staff member Aaron Goins to "Give me email about james' litify lies."

62. Litify was software Defendants had been trying to implement for case management across the firm for three years from 2019 up until Plaintiff was terminated from his employment. Prior to Litify, the Firm used Client Profiles case management software.

63. The Litify software system was not fully operational and had documented synchronization problems affecting all employees through September 2022. It failed to track critical case management matters, including deadlines, payments, and client communications.

64. Up through Mr. Gordon's employment termination in May 2022, he had entered and tracked his case data in both Client Profiles and Litify since 2019 because Litify was not functioning properly, and the two systems would not synchronize or transfer data properly. Thus, Litify failed to automate most of the functions it had been implemented by Defendants to streamline and automate for the Firm.

65. Mr. Goins' response to Mr. Marrese on May 27, 2022 regarding Plaintiff's cases in Litify indicated that he found cases managed by Mr. Gordon that lacked proper updates in the system, and he accused Mr. Gordon of entering fraudulent data to game the system "to inflate his case count" and "trick the system into thinking they are updated." Mr. Marrese then sent the email regarding Litify data to Mr. Miller and Ms. Williams in HR "For James' employment file."

66. Plaintiff's counsel, on his behalf, sent a demand letter to Defendants through partners Jason Miller and John Morgan on July 4, 2022, outlining the material facts herein alleged and asserting that the Firm had violated Mr. Gordon's civil rights under federal and state law. The letter also provided notice of legal action and an obligation to preserve evidence that related to the facts and claims made.

67. The following day, July 5, 2022, Plaintiff's former supervising attorneys exchanged emails; Mr. Wade wrote to Mr. Marrese "Re James…I was of a mind to fire him myself not long after he became my case manager. Had I any other option during the time he was with me I would have taken it." He further denigrated Plaintiff's performance and character - contrary to his correspondence with Mr. Gordon at the time of his employment – that Mr. Gordon was allegedly "unwilling to make a concerted effort to meet any goal,

uninterested in meeting a minimum effort level-let alone excelling in any way, unaccountable to his clients as he was rarely willingly speaking with them….He came late every day, left early, and barely worked while he was there."

68. Mr. Marrese forwarded Mr. Wade's email to Defendants' HR team the same day.

69. Plaintiff promptly filed his claims before the Florida Commission on Human Relations, but withdrew the charge, opting to refile the claims before the EEOC in December of 2022.

## COUNT I
## Disability Discrimination In Violation of the
## Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111, *et seq*.

70. Plaintiff incorporates by reference paragraphs 1-69 as if fully set forth herein.

71. The Americans with Disabilities Act ("ADA") prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 USC § 12112(a). Such discrimination includes "(b)(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such

applicant or employee because of the disability of such applicant or employee;" and "(b)(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."

72. Disability is defined by the ADA as including "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment…." 42 USC § 12102(1). Major life activities include, but are not limited to, engaging in one's employment.

73. Plaintiff has an autoimmune medical condition which is a disability under the ADA, as it substantially impairs daily major life activities, affecting his mobility and causing pain.

74. Plaintiff is a "qualified individual" under the ADA and performed the essential functions of his position admirably for nearly twenty years, and during the COVID-19 pandemic, continued to perform his job functions remotely from his home office without incident.

75. Plaintiff has a physical impairment, namely an autoimmune condition, that substantially limits one or more major life activities, including daily function and employment.

76. In April 2021, Plaintiff provided medical documentation of his disability and requested reasonable accommodations, upon solicitation of the same from Defendants with regard to COVID-19 safeguards, including continuing to work remotely, which had been successfully implemented for over a year.

77. Defendants failed to engage in any interactive process regarding Plaintiff's request for disability accommodations and ultimately ignored the request.

78. In August 2021, Defendants implemented a COVID-19 vaccination mandate, requiring all staff to obtain the shots. Plaintiff again provided medical documentation of his disability and statement from his doctor requesting accommodation from the vaccination mandate and masking.

79. Yet again, Defendants failed to acknowledge Plaintiff's request for accommodation, failed to engage in any interactive process to discuss possible accommodations, and ignored the request.

80. Thereafter, Defendants engaged in a campaign of harassment against Plaintiff, expressly asking him to leave the Firm.

81. Defendants disciplined Plaintiff twice, including suspension without pay, without notice for violations of a policy that had not yet been implemented in

the Firm and which was not applicable to his position once applied across the office for hourly wage workers.

82. Defendants disparaged Plaintiff in email exchanges expressing alleged misconduct by Plaintiff and poor performance with no objective substantiation, as he continued to receive performance-based bonuses through the relevant period.

83. When Plaintiff refused voluntarily to resign due to the hostile work environment created by Defendants due to his disability, Defendants unlawfully terminated Plaintiff's employment on May 16, 2022.

84. Additionally, Defendants engaged in prohibited employment practices when it perceived Plaintiff as disabled and unable to complete the functions of his job in his medical status and unlawfully terminated his employment on the basis of this perception.

85. Defendants' presumption of Plaintiff's risk in the workplace was not based on any reasonable understanding of the facts regarding his ability to perform his essential job duties with or without accommodation. Defendants failed to make any individualized assessment regarding either Plaintiff's actual disability or his perceived disability.

86. Defendants' unlawful conduct toward Plaintiff constitutes failure to accommodate his disability, unlawful termination, discriminatory disparate

treatment of Plaintiff due to his disability, and creating a hostile work environment against Plaintiff because of his disability.

87. Defendants' unlawful discrimination is the direct and proximate cause of deprivation of Plaintiff's equal employment opportunities and his economic and non-economic damages.

88. Defendants' conduct was so willful and wanton and in such reckless disregard of Plaintiff's statutory rights as to entitle him to an award of punitive damages against Defendants, to deter them and others from such conduct in the future.

WHEREFORE, Plaintiff Gordon seeks this Court's judgment against Defendants for violation of his rights under the ADA and requests this Court award him damages for backpay, front pay, compensatory and punitive damages, order Defendants to remove all discriminatory disciplinary documentation from his personnel file, award Plaintiff attorney's fees and costs, and any other such relief as this Court deems just and proper.

## COUNT II
### Disability Discrimination in Violation of the Florida Civil Rights Act
### FL Stat. § 760.07, § 760.10

89. Plaintiff incorporates by reference paragraphs 1-69 and 73-88 as if fully set forth herein.

23

90. The Florida Civil Rights Act ("FL CRA") prohibits an employer from discriminating against an employee "because of race, color, religion, gender, pregnancy, national origin, age, handicap, or marital status in the areas of education, employment, or public accommodations." Fl. Stat. § 760.07.

91. Prohibited employment practices include:

   a. "(1)(a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

   b. "(1)(b) To limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or adversely affect any individual's status as an employee, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

   c. "(2) to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status or to classify or refer for employment any individual on the basis of race,

color, religion, sex, pregnancy, national origin, age, handicap, or

marital status."

Fl. Stat. § 760.10.

92. Defendants are subject to FL CRA, as an employer "employing 15 or more

employees for each working day in each of 20 or more calendar weeks in the

current or preceding calendar year…." Fl. Stat. § 760.02(7).

93. As set forth in detail in Count I herein, Defendants engaged in prohibited

employment practices in discrimination against Plaintiff on the basis of his

disability: refusing to address his accommodation requests to Firm policies,

harassing him as a result of his request for exemption, creating a hostile

environment with the purpose of seeking his resignation, and terminating his

employment.

94. Defendants' unlawful discrimination is the direct and proximate cause of

deprivation of Plaintiff's equal employment opportunities and his economic

and non-economic damages.

95. Defendants' conduct was so willful and wanton and in such reckless disregard

of Plaintiff's statutory rights as to entitle him to an award of punitive damages

against Defendants, to deter them and others from such conduct in the future.

WHEREFORE, Plaintiff Gordon seeks this Court's judgment against Defendants for

violation of his rights under the FL CRA and requests this Court award him damages

for backpay, front pay, compensatory and punitive damages, order Defendants to remove all discriminatory disciplinary documentation from his personnel file, award Plaintiff attorney's fees and costs, and any other such relief as this Court deems just and proper.

**COUNT III**
**Discrimination On The Basis Of**
**Religious Belief And Practice In Violation Of**
**Title VII Of The Civil Rights Act Of 1964,**
**As Amended ("TITLE VII") 42 U.S.C. §§ 2000e,** *et seq*;

96. Plaintiff incorporates by reference paragraphs 1-69 as if fully set forth herein.

97. Title VII (42 U.S.C. § 2000e-2(a)) provides that:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

98. Religion under the statute "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to

reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). It is well established in the law that part of religious observance and practice may involve refusal of medical treatment and vaccination.

99. Plaintiff Gordon was at all times relevant to his claims qualified for his position and performing his job functions, to the point of meriting performance-based bonus payments and individual bonuses for his work, as well as causing Defendants to recruit him back to the Firm after a brief period of his voluntary resignation and employment elsewhere between 2013-2015.

100.    Mr. Gordon has sincerely held religious beliefs that conflict with his ability to comply with Defendants' COVID-19 vaccination mandate.

101.    Defendants knew specifically that Plaintiff was a Christian and lived according to the principles of his sincerely held religious beliefs.

102.    Plaintiff gave notice to Defendants that his religious beliefs required him to seek accommodation against Defendants' COVID-19 vaccination policy.

103.    Defendants failed to acknowledge Plaintiff's request for accommodation, failed to engage in any interactive process to discuss possible accommodations, and ignored the request.

104.    Defendants' principal partner John Morgan, who expresses his Catholic faith openly, demonstrated religious animus toward Plaintiff's religious beliefs through his firm-wide email correspondence comparing those beliefs to irrational fears of flying, heights, and ghosts; to dogs afraid of fireworks; and to religious beliefs in handling venomous snakes.  Mr. Morgan also called Plaintiff's beliefs "reckless" and stated that the practice of those beliefs was cursing fellow co-workers.

105.    Thereafter, Defendants engaged in a campaign of harassment against Plaintiff, expressly asking him to leave the Firm.

106.    Defendants disciplined Plaintiff twice, including suspension without pay, without notice for violations of a policy that had not yet been implemented in the Firm and which was not applicable to his position once applied across the office for hourly wage workers.

107.    Defendants disparaged Plaintiff in email exchanges expressing alleged misconduct by Plaintiff and poor performance with no objective substantiation, as he continued to receive performance-based bonuses through the relevant period.

108.    When Plaintiff refused voluntarily to resign due to the hostile work environment created by Defendants due to his religious beliefs, Defendants unlawfully terminated Plaintiff's employment on May 16, 2022.

109.    Defendants' unlawful conduct toward Plaintiff constitutes failure to accommodate his religious beliefs, unlawful termination, discriminatory disparate treatment of Plaintiff due to his religious beliefs, and creating a hostile work environment against Plaintiff because of his religious beliefs.

110.    Defendants' unlawful discrimination is the direct and proximate cause of deprivation of Plaintiff's equal employment opportunities and his economic and non-economic damages.

111.    Defendants' conduct was so willful and wanton and in such reckless disregard of Plaintiff's statutory rights as to entitle him to an award of punitive damages against Defendants, to deter them and others from such conduct in the future.

WHEREFORE, Plaintiff Gordon seeks this Court's judgment against Defendants for violation of his rights under Title VII and requests this Court award him damages for backpay, front pay, compensatory and punitive damages, order Defendants to remove all discriminatory disciplinary documentation from his personnel file, award Plaintiff attorney's fees and costs, and any other such relief as this Court deems just and proper.

**COUNT IV**
**Discrimination On The Basis Of**
**Religious Belief And Practice In Violation Of**
**Florida Civil Rights Act**
**FL Stat. § 760.07, § 760.10**

112.    Plaintiff incorporates by reference paragraphs 1-69 and 98-111 as if fully set forth herein.

113.    The Florida Civil Rights Act ("FL CRA") prohibits an employer from discriminating against an employee "because of race, color, religion, gender, pregnancy, national origin, age, handicap, or marital status in the areas of education, employment, or public accommodations." Fl. Stat. § 760.07.

114.     Prohibited employment practices include:

   a.    "(1)(a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

   b.    "(1)(b) To limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or adversely affect any individual's status as an employee, because of such individual's race,

color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

c.  "(2) to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status or to classify or refer for employment any individual on the basis of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status." Fl. Stat. § 760.10.

115.    As set forth in detail in Count III herein, Defendants engaged in prohibited employment practices in discrimination against Plaintiff on the basis of his religious beliefs and practices: refusing to address his accommodation requests to Firm policies, harassing him and singling him out among staff for his religious beliefs as a result of his request for exemption, creating a hostile environment with the purpose of seeking his resignation, and terminating his employment.

116.    Defendants' unlawful discrimination is the direct and proximate cause of deprivation of Plaintiff's equal employment opportunities and his economic and non-economic damages.

117.    Defendants' conduct was so willful and wanton and in such reckless disregard of Plaintiff's statutory rights as to entitle him to an award of punitive

damages against Defendants, to deter them and others from such conduct in the future.

WHEREFORE, Plaintiff Gordon seeks this Court's judgment against Defendants for violation of his rights under the FL CRA and requests this Court award him damages for backpay, front pay, compensatory and punitive damages, order Defendants to remove all discriminatory disciplinary documentation from his personnel file, award Plaintiff attorney's fees and costs, and any other such relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff James Gordon demands trial by jury on all issues so triable.

Filed this 27th Day of February, 2025

Respectfully submitted,

 _/S/Rachel L.T. Rodriguez_
Rachel L.T. Rodriguez, Esq.
Florida Bar No. 110425
VIRES LAW GROUP, PLLC
515 N. Flagler Dr., Ste 350
West Palm Beach, FL 33401
E-mail: rrodriguez@vireslaw.group
Phone: 561-370-7383

*Attorney for Plaintiff*

32